IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME I. MARCUS | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| RAPID ADVANCE, LLC, | : | |
| et al. | : | No. 12-884 |
| Defendants. | : | |

<u>MEMORANDUM ORDER</u>

AND NOW, this 7th day of June, 2013, upon consideration of Defendants' Motion to Dismiss (Doc. No. 71) and the Parties' Responses and Replies thereto (Doc. Nos. 75, 79, 81, and 82), it is hereby ORDERED that the Motion is GRANTED. The Clerk of Court shall close this case for statistical purposes.

I.   Factual Background

This action arises out of a complicated series of financial transactions between Plaintiff Jerome I. Marcus ("Marcus") and Defendant Rapid Advance, LLC ("Rapid Advance"), which we understand as follows.

Defendant Lee J. Jundanian ("Jundanian") organized Rapid Advance in 2005. Jundanian, personally and through his family trust, owned an 80% majority interest in Rapid Advance. Members of the Cherner family owned Rapid Advance's remaining shares as follows: Defendant Jonathan Cherner (7%), the Jonathan Cherner Trust (3%), Defendant Andrew Cherner (2%), and the Andrew Cherner Trust (8%). Defendant Jeremy Brown ("Brown") served as Rapid Advance's Chief Operating Officer. Defendant Joseph Looney ("Looney") served as Rapid Advance's General Counsel.

According to the Second Amended Complaint ("the Complaint"), Jundanian and Marcus were "trusted friends," (Doc. No. 60 at ¶ 54) and at Jundanian's behest, Marcus made six unsecured loans to

1

Rapid Advance, totaling $6.25 million, between May 2007 and January 2009. (Id. at ¶¶ 57 and 58). Marcus alleges that, while Jundanian requested that Marcus make said loans, the loans were, in fact, procured by Brown and Looney, who used Jundanian as a conduit to obtain Marcus' trust. (Id. at ¶ 54). According to Marcus, in order to secure the loans, Brown and Looney prepared false financial information that Jundanian provided Marcus, which fraudulently exaggerated Rapid Advance's financial standing and profitability.

Plaintiff alleges that Brown, Looney, Jonathan Cherner, and Andrew Cherner later executed a scheme to avoid repaying Rapid Advance's debts to Plaintiff and to take over Rapid Advance. Marcus specifically alleges that, through false financial documents, Defendants convinced Marcus to convert the $6.25 million owed to him into a Ten Percent (10%) equity interest in Rapid Advance. Defendants later revealed that Rapid Advance was in poor financial standing and convinced Marcus to rescind his equity conversion in order to claim tax deductions on his now uncollectable loans ("the Equity Rescission"). Once Marcus' ownership interest in Rapid Advance was converted back into unsecured debt, Brown, Looney, Jonathan Cherner, and Andrew Cherner organized a new entity, Rapid Financial Services, LCC ("RFS"), which allegedly acquired Rapid Advance's business, assets, and liabilities, except for, inter alia, Rapid Advance's debts to Marcus.

In effectuating the Equity Rescission, Marcus, Rapid Advance, and Jundanian executed a Rescission Agreement, dated December 31, 2009. (Doc. No. 71-4). Rapid Advance, RFS, Jonathan Cherner, Andrew Cherner, Jundanian, and Marcus further executed an Agreement of Settlement and Release, dated January 12, 2010 ("the Release").[1] (Doc. No. 71-5). Plaintiff alleges that in June 2011, he acquired a 2009 audit of Rapid Advance's 2008 financial statements. According to the Complaint, this audit was inconsistent with the financial information that Defendants previously provided Marcus and

---

[1] The release applies to, inter alia, each party's officers, directors, agents, representatives, employees, and managers. It is undisputed that Brown was Rapid Advance's Chief Operating Officer and that Looney was Rapid Advance's General Counsel. Accordingly, we read the Release to apply to Brown and Looney, in their capacity as officers and employees of Rapid Advance.

upon which Marcus relied in (1) executing certain loans, (2) rescinding his equity interest in Rapid Advance, and (3) executing the Release.

Marcus filed the instant action on February 21, 2012, alleging various violations of federal and state securities laws in addition to state law claims of fraud, negligent misrepresentation, tortious interference, civil conspiracy, breach of fiduciary duty, fraudulent transfer, and breach of contract. Marcus further seeks a declaratory judgment regarding the terms of private agreements among certain Defendants.

Currently before the Court is Defendants' Motion to Dismiss (Doc. No. 71). Defendants' Motion principally argues that we should dismiss Plaintiff's Complaint because the 2010 Release bars the claims therein. Plaintiff replies that we should rescind the Release as fraudulently induced and permit Plaintiff's claims to move forward. For the reasons stated below, we decline to rescind the Release and GRANT Defendants' Motion.

    II.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard 'asks for more than a sheer possibility that a defendant has acted unlawfully.'" Miles v. Twp. of Barnegat, 343 F. App'x 841, 844 (3d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1949). Rather, plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1949).

When evaluating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), "the facts alleged [in the complaint] must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately

prevail on the merits." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). While we must draw all reasonable inferences in favor of the plaintiff, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Additionally, the "presumption of truth" does not apply "to legal conclusions couched as factual allegations or to '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" Miles, 343 F. App'x at 845 (quoting Iqbal, 129 S. Ct. at 1949).

In considering a motion to dismiss, we may look to the allegations made in the complaint, the exhibits attached to the complaint, and any documents whose authenticity no party questions and whose contents are alleged in the complaint. Pryor v. Nat'l Coll. Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002). Documents attached to a defendant's Rule 12(b)(6) motion to dismiss may be considered if they are referred to in the plaintiff's complaint and if they are central to the plaintiff's claims. Id.

### III. Discussion

#### A. Release as an Affirmative Defense

An assertion that a release bars a plaintiff's complaint is generally considered an affirmative defense that must be pleaded in the defendant's answer. Fed. R. Civ. P. 8(c). Nonetheless, the law of this Circuit (the so-called "Third Circuit Rule") permits a defense based on a release to be raised by motion under Rule 12(b)(6), where the release is raised in the complaint or the defense is apparent on the face of the complaint. Rycoline Prods., Inc. v. C & W Unlimited, 109 F.3d 883, 886 (3d Cir.1997); Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 897 (3d Cir.1975) (reversing district court's denial of motion to dismiss based on release defense). Here, the release at issue forms the basis of relief that Plaintiff seeks in his Complaint, and the defense that Defendant raises is apparent based on Plaintiff's allegations alone. (Doc. No. 60 at ¶¶ 86, 93-98)

#### B. Choice of Law

The parties dispute whether Pennsylvania or Maryland law should control our analysis of the Release. We find that we need not look beyond the plain language of the Release—which states that Maryland law shall govern the agreement's validity—to resolve this choice of law issue.

The Release explicitly states: "This Agreement shall be governed by and construed both as to validity and performance and enforced in accordance with the laws of the State of Maryland without giving effect to the choice of law principles thereof." (Doc. No. 71-5 at p. 11, ¶ 14). While Defendants cite <u>Jiffy Lube Int'l, Inc. v. Jiffy Lube of Penn. Inc.,</u> 848 F. Supp. 569 (E.D. Pa. 1994), for the proposition that a contractual choice of law provision does not govern related tort claims, this principle is inapplicable at this stage. In this case's current posture, Defendants argue that the Release precludes Plaintiff's claims, and Plaintiff replies that the Release should be rescinded as invalidly executed. These questions regarding the Release's validity are purely contractual in nature, and we therefore assess them under Maryland contract law, as the parties' agreement requires of us.

In assessing the Release's effect on this action, we apply Maryland contract law as interpreted by the Maryland Court of Appeals. <u>See</u>, <u>e.g.</u>, <u>Nationwide Mut. Ins. Co. v. Buffetta</u>, 230 F.3d 634, 637 (3d Cir. 2000). In the absence of guidance from the Maryland Court of Appeals, we consider decisions of the state's intermediate appellate courts and decisions of federal courts interpreting Maryland law for assistance in predicting how the state's highest court would rule. <u>Gares v. Willingboro Township</u>, 90 F.3d 720, 725 (3d Cir. 1988).

   C. The Release

On January 12, 2010—twelve days after Marcus executed the Equity Rescission—the parties executed an Agreement of Settlement and Release. The Release is a comprehensive release of all past, present, or future claims arising out the financial transactions between Marcus and Rapid Advance. The Release contains, <u>inter</u> <u>alia</u>, the following provisions:

> 2. <u>General Release and Waiver of Claims</u>
> . . . [Marcus] expressly, irrevocably, unconditionally and completely releases, acquits and forever discharges [Defendants] for any and all claims, counts, actions, causes of action, cross-complaints, counter-complaints, rights, demands, obligations, requests, suits, lawsuits, damages . . . costs, administrative proceedings, governmental actions or other causes of action of every kind or nature, known or unknown, claimed or unclaimed, which exist or may in the future exist, which in any manner or fashion relate to, arise from or are connected with the funds loaned by [Marcus] to Rapid Advance or the conduct by Rapid Advance of its business. For the avoidance of doubt, [Marcus} agrees: (i) that the sale of assets by Rapid Advance to RFS is fair and reasonable, (ii) that [he] will not under any circumstances (and regardless of any facts subsequently discovered by [him]) seek to challenge the transactions

5

> between Rapid Advance and RFS on any theory . . . or institute any judicial or administrative challenge to set aside or seek damages in respect of the transactions between Rapid Advance and RFS, and (iii) that [Defendants other than Rapid Advance] are not liable to [Marcus] for any of the debts, obligations or liabilities of Rapid Advance . . .
>
> 3(B). <u>Risk of New Facts</u>
> Each party acknowledges that it or its attorney may hereafter discover facts different from or in addition to the facts which such party or its attorney now knows or believes to be true with respect to the subject matter of this Agreement, but it is the intention of the Parties to fully, finally, absolutely, and forever settle any, and all claims, disputes and differences with do now exist or heretofore have existed between them and in furtherance of such intention the releases herein given shall be and remain in effect as full and complete general releases notwithstanding the discovery of any such different or additional facts.
>
> 12. <u>Agreement Understood</u>
> . . .
> Each of the Parties acknowledges, represents and declares that, in executing this Agreement, they rely solely upon its own judgment, belief, and knowledge, and the advice and recommendation of its or his own independently selected counsel concerning the nature, extent, and duration of its rights and claims, and that no party has been influenced to any extent whatsoever in executing the same by any representations or statements covering any matter made by any of the Parties hereto or by any person representing them, or any of them. Further, each party hereto acknowledges, represents, and declares that he has carefully read this Agreement, knows and understands that contents and voluntarily executed the same freely without duress or pressure.

In addition to these waivers of liability, the Release contains a standard integration clause. (<u>Id.</u> at p. 9 ¶ 11). It is undisputed that both the Equity Rescission and this Release were executed by the parties following negotiation and with the advice and assistance of independent legal counsel.

> D.  Standard of Review

On its face, the parties' Release is a comprehensive document, which seems to contemplate this very suit and explicitly preclude it. Nonetheless, Plaintiff argues that, despite the Release's unambiguous language, the document was procured by fraud and we should therefore rescind the Release to permit Plaintiff's claims. We find Plaintiff's request inconsistent with Maryland law.

> 1.  Parol Evidence

Maryland follows the "objective law of contracts," which disfavors judicial intervention in contract interpretation and counsels against the use of extrinsic evidence for interpretative purposes. <u>Herget v. Herget</u>, 319 Md. 466, 470 (1990); <u>see</u> also <u>Calomiris v. Woods</u>, 353 Md. 425, 432-33, 727 A.2d 358, 361-62 (1999). The Court of Appeals instructs that the procedure to be followed in interpreting a

6

contract is as follows: "[the Court] must first determine from the language of the agreement itself, what a reasonable person in the position of the parties would have meant at the time it was effectuated. Where the language of the contract is unambiguous, its plain meaning will be given effect. There is no need for further construction." Herget, 319 Md. at 470 (citing Aetna Cas. & Sur. v. Ins. Comm'r, 293 Md. 409, 420 (1982)).

Consistent with Maryland's policy of judicial restraint, Maryland's parol evidence rule discharges all prior agreements and renders legally inoperative communications and negotiations leading up to a fully integrated agreement. Calomiris, 353 Md. at 432–33 (citing Restatement (Second) of Contracts § 213 (1979)). The Court of Appeals stresses that the parol evidence rule prohibits admission of extrinsic evidence for the purposes of ascertaining the meaning and scope of clear contractual language, and it therefore "provides a necessary legal foundation for the certainty of contracting parties." Calomiris, 353 Md. at 432–33.

2. Fraud Exception

Like all rules, Maryland's parol evidence rule has exceptions. Importantly, under Maryland law, parol evidence is admissible to alter, interpret, or set aside a fully integrated agreement, where the party seeking to submit such evidence makes a cognizable claim that he was induced to enter the agreement by fraud. Pemrock, Inc. v. Essco Co., 252 Md. 374, 380 (1969); Greenfield v. Heckenbach, 144 Md.App. 108, 121–22 (2002); see also Baqai v. Tri-State Community Health Center, Inc., Civ. No. 09-2135, 2010 WL 605714 (D. Md. Feb. 17, 2010) (citing Fowler v. Benton, 229 Md. 571 (1962) ("[where] fraud is alleged to have caused the execution of a written contract, a merger clause therein is not conclusive")). Under Maryland law, to state a cognizable claim of fraud, a plaintiff must allege: (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and such reliance was reasonable as a matter of law, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. Gourdine v. Crews, 405 Md. 722, 758 (2008).

Despite recognizing an exception to the parol evidence rule for contracts induced by fraud, Maryland courts hold that, the fraud exception "must not be stretched or inflated in a way that would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties. Central Truck Center, Inc. v. Central GMC, Inc., 194 Md.App. 375, 391 (2010) (quoting One-O-One Enterprises Inc. v. Caruso, 848 F.2d 1283, 1287 (D.C. Cir 1988) (Ruth Bader Ginsburg, J.) (granting motion to dismiss based on agreement's integration clause and holding that "if the parol evidence rule is to retain vitality . . . a party with the capacity and opportunity to read [the] written contract, who [ ] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice . . . cannot later claim fraud in the inducement") (internal quotations and citations omitted)). As one court has observed, "[the] fraud exception would swallow up the rule if representations made during negotiations, but not included in the contract as executed, could be characterized as fraud and then used to undo an otherwise complete agreement." Hercules & Co., Ltd v. Shama Restaurant Corp., 613 A.2d 916, 929 (D.C. 1992).

Additionally, Maryland courts generally find a sophisticated party's reliance on significant representations that are later superseded by an integrated agreement, unreasonable as a matter of law. The Special Court of Appeals explains that, when interpreting an agreement among sophisticated parties, "silence in a final agreement containing an integration clause—in the face of prior explicit representations—must be deemed an abandonment or excision of [ ] earlier representations." Central Truck, 194 Md. App. at 391 (citing One-O-One Enterprises Inc., 848 F.2d at 1287).  Under such circumstances, where representations of "large significance to the parties' bargain" are superseded by an integrated agreement, "there [is] no representation upon which [a party] could [reasonably] base a fraud claim." Id. at 392 (holding that sophisticated business party could not overcome a written agreement's integration clause by invoking the fraud-in-the-inducement exception, based on allegedly fraudulent financial representations not memorialized in the agreement). In reaching this conclusion, the Court borrowed the D.C. Circuit's language: "We have here the case of a party with the capacity and opportunity to read a written contract who [has] execute[d] it, not under any emergency, and whose

signature was not obtained by trick or artifice; such a party, if the parol evidence rule is to retain vitality, cannot later claim fraud in the inducement." Id.

        3.   Releases

Under Maryland law, releases are contracts that are read and interpreted under ordinary contract principles—including, inter alia, the parol evidence rule. Bernstein v. Kapneck, 290 Md. 452, 458–59 (1981). In Bernstein, the Maryland Court of Appeals set out three principles that underlie this conclusion: (1) in the absence of legal barriers, "parties are privileged to make their own agreement and thus designate the extent of the peace being purchased;" (2) in a time of "burgeoning litigation," private settlement of disputes is to be encouraged, and "a release evidencing accord and satisfaction is a jural act of exhalted significance which without binding durability would render the compromise of disputes superfluous, and accordingly unlikely," and (3) according to conventional rules of construction, when a release is stated in clear and unambiguous language, the words should be given their ordinary meaning. Id. at 459–60. Accordingly, the Court of Appeals instructs that courts interpret releases based on their clear, objective language. Id. at 458 (citing Schmidt v. Smith, 299 Minn. 103, 216 N.W.2d 669, 671-72 (1974) (rejecting position that a release may be terminated upon the discovery of a party's previously unknown personal injuries)).

In applying the parol evidence exception for fraud, Maryland law expresses a strong preference for upholding broad releases—including those which release claims that are unknown or unforeseen at the time of a release's execution. Herget v. Herget, 319 Md. 466, 473 (1990) ("We reject the notion that the parties in the case before us were incapable of releasing a right that did not then exist."); Bernstein, 290 Md. 452 (1981). In Bernstein, the Maryland Court of Appeals analyzed and rejected a trend among its sister states which permits parties to set aside releases of unforeseen claims, when unanticipated personal injuries surface subsequent to the release's execution. 290 Md. 452 (1981). The Court acknowledged that "release[s] of unknown injuries [are] almost universally permissible," and the Court rejected the treatment of "personal injury releases, because they relate[ ] to human interest instead of

commercial transactions, as justifying the development of a special body of contract law." Id. at 456, 461.

The Bernstein Court stressed that, where a release expresses an unambiguous intent to release unknown injuries, the nature and extent of those injuries is not relevant when unforeseen injuries later arise. Id. at 462. In declining to carve-out an exception to this rule, the Court explained:

> We are not convinced that violence to the human body presents a unique situation such that an independent set of principles is required to interpret contracts concerning the injury, and indeed, we can conceive of a number of circumstances where a binding release of other types of claims can create hardship of an equal or greater dimension eliciting sympathy and compassion of comparable magnitude. If hardship is the criterion, then the line of enforceability should not be draw in accordance with the nature of the claim, but rather the extent of the hardship suffered. If, on the other hand, the issue is (as we think) whether there has been a mutually intended release of unknown injuries then the nature and extent of the misfortune is beside the point, for the inquiry focuses on the intention of the parties to the contract and not on knowledge gained subsequent to its execution.

Id. at 462.

The Bernstien Court highlighted an important policy consideration underlying its decision: "there must be a zone of free action within which differences may be terminated by the parties with the complete assurance that the matter is final. To permit [releases] to be vacated except for the most compelling reason creates uncertainty, chaos, and confusion with respect to future dispositions." Id. at 458 (internal quotations omitted) (quoting Schmidt v. Smith, 299 Minn. 103, 216 N.W.2d 669, 671-72 (1974)). Accordingly, the Court concluded, "if from the particular language of a release … there was a conscious and deliberate intention to discharge liability from all consequences of [the incident at issue] the release will be sustained and bar any future claims of previously unknown injuries." Bernstein, 290 Md. at 460 (internal quotations and citations omitted).

Since Bernstein, the Court of Appeals has reaffirmed that Maryland law upholds parties' freedom to broadly release unknown and unforeseen claims that did not exist at the time of a release's execution. See e.g. Herget v. Herget, 319 Md. 466, 473 (1990). Importantly, Maryland courts have never articulated an exception to this rule for agreements which release unknown claims of fraud, and absent

such guidance, this Court declines to carve-out such an exception here. Accordingly, we find that, Maryland law upholds the release of unknown or unforeseen claims of fraud.

Like ordinary contracts, a release may be set aside where the release itself was induced by fraud. Nonetheless, in order to give meaning and effect to agreements which release fraud claims, courts generally hold that: "A party [who] releases a fraud claim may later challenge that release as fraudulently induced only if [the party] can identify a separate fraud from the subject of the release." Centro Empresarial Compresa S.A. v. America Movil, S.A.B. DE C.V., et al., 17 N.Y.3d 269, 276 (2011) (citing Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 527–28 (2d Cir. 1985)); see also Seven Instruments, LLC v. AD Capital, LLC 32 A.3d 391, 396–400 (Del. Ch. 2011) (to set aside a release for fraud, the alleged fraud must be "different sequentially and conceptually" form the fraud that was the subject of the settlement) (quoting E.I. DuPont de Nemours and Co. v. Florida Evergreen Foliage, 744 A.2d 457 (Del. 1999)); Burt v. Maasberg, No. 12-0464, 2013 WL 1314160 (D. Md. Mar. 31, 2013) (to set aside release for fraud the alleged fraud must have occurred subsequent to the fraud that is the subject of the release). We find this principle consistent with Maryland law, which: (1) unequivocally upholds the broad release of claims that are unknown at the time of a release's execution (See Centro Empresarial Compresa S.A., 17 N.Y.3d at 276 (acknowledging that if a party could set aside a release of fraud claims based on the same fraud that the agreement releases, no party could ever release unknown claims of fraud); and (2) places great weight on the finality of released claims (See Seven Instruments, LLC, 32 A.3d at 400 ("Settlement would be impossible if a party could later rescind a release based on the same or similar fraud allegations [that the agreement releases]. A negotiated release would merely become the starting point for further litigation.")).

    D.  Discussion

Based on the allegations in the Complaint, we decline to rescind the Release as Plaintiff requests, and we grant Defendants' Motion to Dismiss.

The parties to this action executed a broad and comprehensive release, which "irrevocably, unconditionally and completely" releases all claims "of every kind or nature, known or unknown,

11

claimed or unclaimed, which exist or may in the future exist, which in any manner or fashion relate to [the financial transactions between Marcus and Rapid Advance]." (Doc. No. 71-5). The Release further reaffirms that Marcus "will not under any circumstances (and regardless of any facts subsequently discovered by [him]) seek to challenge the transactions between Rapid Advance and RFS on any theory" and that even if any party subsequently discovers new facts, "it is the intention of the Parties to fully, finally, absolutely, and forever settle any, and all claims . . . which do now exist or heretofore have existed between them . . . notwithstanding the discovery of any such different or additional facts." Id. Each party further affirmed that in executing the Release, "[he] rel[ied] solely upon [his] own judgment, belief, and knowledge, and the advice and recommendation of [his] own independently selected counsel concerning the nature, extent, and duration of [his] rights and claims." Id. Finally, the Release contains a standard integration clause.

      The intent of the parties as manifested by the Release's unambiguous language was to prevent the very action that Plaintiff now brings. As the Maryland Court of Appeals found in Bernstein: "It is readily apparent from a mere glace at this verbiage that the release could not be more clear, more specific, more complete, more all-inclusive or more all-embracing. It would require turning the English language on its head to conclude that, from these words used, the releasers did not by this document exhibit a clear desire to extinguish the claim for the damages [Plaintiff now seek[s]." 290 Md. at 464.

      Plaintiff asserts that, despite the Release's unambiguous language, we should apply the fraud exception to the parol evidence rule to rescind the Release as fraudulently induced. We disagree, and hold that, on the facts before us, application of the fraud exception conflicts with clearly defined Maryland law. Additionally, even if we applied the fraud exception, Plaintiff's averments of fraud fail as a matter of law.

      As set forth above, Maryland courts hold that, the fraud exception "must not be stretched or inflated in a way that would severely undermine the policy of the parol evidence rule. Central Truck Center, Inc. v. Central GMC, Inc., 194 Md.App. 375, 391 (2010) (quoting One-O-One Enterprises Inc. v. Caruso, 848 F.2d 1283, 1287 (D.C. Cir 1988) (Ruth Bader Ginsburg, J.) ("if the parol evidence rule is to

retain vitality . . . a party with the capacity and opportunity to read [the] written contract, who [ ] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice . . . cannot later claim fraud in the inducement") (internal quotations and citations omitted)).

In order to avoid any misunderstanding and to make clear that the only understanding between the parties was that expressed in the Release, the parties before us agreed that: "Each of the Parties acknowledges, represents and declares that, in executing this Agreement, they rely[ied] solely upon its own judgment, belief, and knowledge, and the advice and recommendation of its or his own independently selected counsel." (Doc. No. 71-5). The parties further included an integration clause which states that "[a]ll prior and contemporaneous conversations, negotiations, possible and alleged agreements and representations, covenants and warranties with respect to the subject matter hereof are waived, merged herein and superseded hereby." Id.

The Release explicitly and unambiguously superseded any prior representations regarding the transactions between Marcus and Rapid Advance, and the document did not leave any prior representations upon which Plaintiff could reasonably allege a claim for fraud. Central Truck Center, Inc., 194 Md.App. at 392 (citing One-O-One Enterprises, Inc. v. Caruso, 668 F. Supp. at 698). Had Plaintiff not wished to forgo suing on a fraud claim that he might subsequently discover, this sophisticated and well counseled party could have insisted that the Release be conditioned on the truth of the financial information provided by Defendants and on which Plaintiff purportedly relied. Central Truck Center, Inc., 194 Md.App. at 391 (quoting One-O-One Enterprises, Inc., 848 F.2d at 1287 ("silence in a final agreement containing an integration clause—in the face of prior explicit representations—must be deemed an abandonment of excision of those earlier representations")). In the absence of such a qualification, Plaintiff's purported reliance on significant financial representations that were later superseded by an integrated agreement was unreasonable as a matter of law. Id.

The allegations in the Complaint further fail state a claim that Plaintiff was fraudulently induced to sign the Release. Plaintiff is a sophisticated businessperson who was represented by counsel throughout the execution of the transactions and Release at issue. See Central Truck Center, Inc., 194

13

Md.App. at 391. The Release explicitly affirms that Plaintiff had ample opportunity to read the Release with the advice of independent counsel. See Id., at 392–93. Plaintiff did not execute the document under any emergency nor was he tricked into signing it. As the Central Truck Center Court observed, "such a party, if the parol evidence rule is to retain vitality, cannot later claim fraud in the inducement." Id. (internal quotations omitted) (citing One-O-One Enterprises, Inc., 848 F.2d at 1287).

Even had Plaintiff alleged a cognizable claim that the release was induced by fraud, Plaintiff fails to allege that the Release was induced by any fraud separate from the fraud that the Release contemplates and discharges. Plaintiff's allegations of fraud appear in a section of the Complaint entitled "Fraudulent Inducement of Equity Rescission, Settlement Agreement and Release." Doc. No. 60 §§ 79-104. Each of the allegedly fraudulent representations contained therein regards fraud in the underlying financial transactions between Marcus and Rapid Advance, and Plaintiff avers that the Release was similarly induced by fraud because Plaintiff only discovered these allegedly fraudulent representations following the Release's execution.[2] Nonetheless, it is quite clear that the Release was intended to unequivocally discharge any claim that the underlying financial transactions were the result of fraud. Plaintiff is a

---

[2] Plaintiff additionally asserts that the Release was induced by a fraud separate from that contemplated by the agreement, because the Release states that the Equity Rescission was in Rapid Advance and Marcus' best interest.

A representation that a particular transaction is in a party's best interest cannot support a legally cognizable claim of fraud. A party alleging fraud must allege that he reasonably relied upon a misrepresentation of material fact. Parker v. Columbia Bank, 91 Md. App. 346, 359-60 (1992). A misrepresentation of material fact cannot be an "estimate" or an "opinion." Id. (representation that "the value is in the ground" and that there is "nothing to worry about" insufficient) (citing Polson v. Martin, 228 Md. 343, 346 (1962) ("puffing" insufficient)). Additionally, a statement that is "vague and indefinite in its nature and terms, or is merely a loose conjectural or exaggerated statement, is not sufficient to support" a fraud action, because "such indefinite representations ought to put the person to whom they are made, upon the inquiry, and if he chooses to put faith in such statements, and abstained from inquiry, he has no reason to complain." Goldstein v. Miles, 159 Md. App. 403, 436, 859 A.2d 313, 332 (2004) (citing Fowler v. Benton, 229 Md. 571, 579, 185 A.2d 344 (1962)).

In this case, a representation that the Equity Rescission was in Marcus' best interest is a statement of loose conjecture and a matter of opinion that cannot support a fraud claim. Marcus held no right to rely on such a statement without independent inquiry, and Marcus fails to allege that the Equity Rescission was not, in fact, in his best interest at the time that it was executed. What is clear is that, Marcus and Rapid Advance engaged in a series of financial transactions that culminated in Rapid Advance's dissolution and Marcus' execution of a Release of all claims against Rapid Advance. In this context, a representation that one piece of this transaction was in Marcus' best interest should have put Marcus and his attorney on notice to conduct an independent inquiry into the representation's validity, and such a statement, standing alone, is wholly insufficient to set aside a carefully worded release.

business party who was engaged in complex, multi-million dollar transactions, with the aid and advice of legal counsel. Plaintiff negotiated and executed an extraordinarily broad Release, without coercion or undue persuasion. Plaintiff cannot now invalidate that Release by claiming ignorance of the depth of the claims that the Release set aside. "[I]t was in [Plaintiff's] power to inform himself as to the contents of the [R]elease[ ] before he signed [it]," yet, he failed to do so. Gingell v. Backus, 246 Md. 83, 89 (1967) (internal citations omitted).

The relief that Plaintiff now seeks begs the question, "what other anticipatory language could be used when the parties to an agreement wish to relinquish all future rights and interests known and unknown?" Herget v. Herget, 319 Md. 466, 473 (1990). In the face of this Release's comprehensive and unambiguous language, we could not genuinely rescind the Release without holding that Maryland law does not entitle a sophisticated and well-counseled party to forever discharge unknown claims of fraud. We find such a conclusion wholly inconsistent with clearly established Maryland law—which unequivocally upholds releases of unforeseen claims and favors the finality that such releases provide. For these reasons, we decline to rescind the Release and grant Defendants' Motion.

IV.     Conclusion

For the reasons set forth above, we find that the Release bars Plaintiff's Complaint as a matter of law. It is hereby ORDERED that Defendants' Motion to Dismiss (Doc. No. 71) is GRANTED. The clerk shall close this action for statistical purposes.

BY THE COURT:

/s/Legrome D. Davis

Legrome D. Davis, J.